United States Court of Appeals
Fifth Circuit

**F I L E D**

January 14, 2005

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

---

No. 03-20991

---

**HOWARD PAUL GUIDRY,**

**Petitioner-Appellee,**

**versus**

**DOUG DRETKE, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
CORRECTIONAL INSTITUTIONS DIVISION,**

**Respondent-Appellant.**

---

**Appeal from the United States District Court
for the Southern District of Texas**

---

Before BARKSDALE, GARZA, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Howard Paul Guidry was convicted in Texas state court of murder for remuneration in Harris County, Texas, and sentenced to death. He was granted conditional federal habeas relief based on the following two claims, involving evidence admitted for the State at trial: his confession violated his Fifth Amendment right against self-incrimination; and hearsay testimony against his interest violated his Sixth Amendment confrontation right. The Texas Court of Criminal Appeals had denied those claims on direct appeal. *Guidry v. State*, 9 S.W.3d 133 (Tex.Crim.App. 1999), *cert. denied*, 531 U.S. 837 (2000) (*Guidry I*). In denying Guidry's Sixth Amendment claim, the Court of Criminal Appeals had held: although

the hearsay testimony against Guidry's interest had been admitted erroneously, the error was harmless. *Id*. at 149-52.

The State contends the district court reversibly erred because: (1) under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), the district court abused its discretion by conducting an evidentiary hearing on the confession's constitutionality, despite the state trial court's having done so for the same issue, involving, according to the State, the same evidence; (2) the district court's non-acceptance of key state court findings of fact and, therefore, of its conclusions of law, did not accord with AEDPA's deferential scheme; and (3) the district court's findings of fact and conclusions of law regarding the confession and hearsay testimony (that their admission into evidence was erroneous and did *not* constitute harmless error) are erroneous.

The district court properly granted conditional habeas relief, pursuant to 28 U.S.C. § 2254(d) (state court decision was based on unreasonable application of clearly established federal law or on unreasonable determination of the facts). **AFFIRMED.**

I.

Farah Fratta was murdered on 9 November 1994; her husband, Robert Fratta, had hired Joseph Prystash to kill her. (Each received the death penalty.) During a custodial interrogation approximately four months after Farah Fratta's murder, Guidry

2

confessed to shooting Farah Fratta and leaving the scene with Prystash. At Guidry's trial, his confession, as well as hearsay testimony against Guidry's interest by Prystash's girlfriend, Mary Gipp, established that, for $1,000, Guidry agreed to help Prystash kill Farah Fratta. The events surrounding this crucial evidence follow.

Guidry was arrested on 1 March 1995 for bank robbery; in his possession was the gun used for Farah Fratta's murder in November 1994. Following a tip from Gipp, detectives investigating Farah Fratta's murder turned their investigation toward Guidry, who was being held at the county jail on the robbery charge.

On 7 March 1995, Detectives Roberts and Hoffman transported Guidry from the jail to the Sheriff's office and questioned him about Farah Fratta's murder. As a result of this interrogation, Guidry gave a statement confessing to it. (He initially confessed to being only the driver, failed a polygraph test, and confessed to being the shooter.) This statement was followed by more detailed, videotaped confessions. (Guidry and the detectives offer sharply contrasting versions of the interrogation leading to the confession.)

Guidry was indicted for the murder of Farah Fratta "for remuneration or the promise of remuneration". TEX. PENAL CODE § 19.03(a)(3). After two pre-trial evidentiary hearings, the trial court denied Guidry's motion to suppress the confession. In March

3

1997, a jury found Guidry guilty of capital murder and, following the punishment phase, answered Texas' special issues in a manner requiring imposition of a death sentence. For the two fact-intensive claims on which conditional federal habeas relief was granted, an extremely detailed description of the proceedings in state and federal court is required.

A.

Central to Guidry's claim that his confession was obtained in violation of the Fifth Amendment are two events: Guidry's 7 March 1995 interrogation and confession; and an in-chambers conversation approximately a week later (15 March), involving, among others, Detective Roberts and Guidry's then-attorneys for the murder charge. These events bear on the two key questions for the Fifth Amendment claim: (1) whether Guidry asked to have his robbery-charge-attorney present during the 7 March interrogation about Farah Fratta's murder; and (2) whether the detectives told Guidry, untruthfully, that Guidry's robbery-charge-attorney had authorized Guidry's cooperation without his attorney's being present. The detectives deny Guidry requested an attorney and deny that they spoke with his robbery-charge-attorney; they claim Guidry confessed voluntarily.

The trial court held a pre-trial hearing on 28 August 1996 on Guidry's motion to suppress the confession; it was continued when it became apparent that Guidry's two attorneys for the murder charge would be required to testify about the 15 March 1995 in-

4

chambers conversation.  A second pre-trial hearing was held on 20 February 1997, involving the same witnesses, but adding testimony by Guidry and his two original/former attorneys for the murder charge.  Following this hearing, the trial court orally denied the suppression motion; post-jury verdict, it entered written findings of fact and conclusions of law on 27 March 1997.  Those findings and conclusions, as well as the testimony at the two pre-trial hearings about the interrogation and in-chambers conversation, follow.

1.

*At the 1997 pre-trial hearing, Guidry* testified about the 7 March 1995 interrogation.  (As noted, he did not testify prior to the initial hearing's being continued in 1996.)  According to Guidry:  his robbery-charge-attorney, Duer, instructed him not to discuss anything with anyone (including officers and other prisoners); Detectives Roberts and Hoffman removed him from the county jail and transported him to their offices for interrogation; Detective Hoffman questioned him initially, left the room, and returned with Detective Roberts; Detectives Roberts and Hoffman then confronted Guidry with pictures of Farah Fratta's body; this frightened Guidry; *he requested his attorney*; and Detective Hoffman refused, while Detective Roberts remained silent.

Guidry testified further:  the detectives left him alone for around one and a half hours; then, Detective Hoffman returned,

5

saying he had a statement from Prystash implicating Guidry; the detective gave the statement to Guidry to read and claimed he had other evidence as well, but that they could work out a deal if Guidry cooperated. Guidry testified:

> And this is all while I was reading the statement [by Prystash]. After I got through reading the statement, I asked [Detective Hoffman] again, I -- I really didn't ask him, *I kind of demanded that I speak to my lawyer that second time*, because I was -- I was really getting scared after the second time ....
>
> And when I told him that, he told me he was going to contact my attorney. At that point in time, he picked up the statement and he left ... the room.

(Emphasis added.) Guidry testified that Detective Hoffman

> ... asked me before he left ... the room -- *when I asked him for my attorney the second time, he asked me who my lawyer was*. And I told him Mr. Layton Duer.
>
> And he said: I'm going to contact your attorney and we're going to see what he says, right. And he stayed in the room maybe a minute getting paperwork together, and he left ... the room.

(Emphasis added.) According to Guidry, after some time passed, Detectives Roberts and Hoffman returned, saying they had contacted Guidry's attorney.

> Detective H[o]ffman ... told me he had contacted my attorney.
>
> He told me my attorney said it was all right for me to answer the question, and don't worry about it, you know, it was no problem.

6

Following this claimed exchange, and in claimed reliance on the alleged conveyed authorization from his attorney, Guidry gave his initial confession.

*At the 1996 (first) pre-trial hearing, Detective Roberts* offered conflicting testimony about knowledge of Guidry's representation.

> Q.   Were you aware of the fact that he, in fact, had an attorney representing him out of the bank robbery?
>
> A.   Somewhere, *subsequent in the conversation*, I was advised that he *did* have an attorney for the aggravated robbery.

(Emphasis added.)   But later in the hearing, Detective Roberts retreated from his Guidry-had-counsel acknowledgment.

> A.   ... *I don't know if he had an attorney or not.*   I was, I assumed he, I don't know, he didn't tell me.   I don't know how, *whether he had been in jail and had been appointed an attorney* [for the bank robbery charge], I *never did confirm* if he had an attorney.
>
> Q.   *So now you are going back to say you didn't even know he had an attorney?*
>
> A.   *Just because somebody's lips move doesn't make it a prayer book.   I never did confirm whether there was an attorney or not.*
>
> Q.   So when he told you he had an attorney, you assumed he was lying, right, so it wasn't a prayer book?
>
> A.   I'm not aware of how I was made aware of it, if he had an attorney or not.

(Emphasis added.)

7

When asked whether he had contacted Guidry's attorney at any time for any purpose, Detective Roberts answered: "I don't *think* I did". (Emphasis added.) He also denied that Guidry requested either to speak with his attorney or to have him present.

*At the 1997 (second) pre-trial hearing, Detective Roberts* gave the following testimony regarding his knowledge of Guidry's representation at the time of the 7 March 1995 interrogation:

> Q. For the record, today, tell us what you knew about who Howard Guidry's attorney was or what information you had at the time the conversation took place between you and him on March the 7, 1995?
>
> A. *I had no knowledge that he had an attorney.*
>
> ...
>
> Q. At any time during your conversation with... Mr. Guidry, either by Detective Hoffman or anybody else in the interview room that date on March 7, 1995, did you learn that Howard Guidry did, in fact, have an attorney on the Klein Bank robbery?
>
> A. No, sir.

(Emphasis added.) Later in the hearing, however, Detective Roberts contradicted this testimony, returning toward his original position at the 1996 pre-trial hearing. This testimony was even more favorable to Guidry because Detective Roberts admitted Guidry told him that he (Guidry) had an attorney.

> Q. Did [Guidry] ever tell you he had an attorney?
>
> A. *Yes, sir.*

8

> Q. But he never told you he wanted to talk to that attorney?
>
> A. That's correct.

(Emphasis added.)

*Detective Hoffman* also testified at the 1996 and 1997 hearings: he read Guidry his **Miranda** rights several times, beginning during the transport from the county jail; Guidry was very cooperative and voluntarily waived his rights and confessed; Detective Hoffman did not know for what offense Guidry had been incarcerated in the county jail; he did not know that Guidry had an attorney for that offense; *Guidry never asked to have his attorney present during the interrogation or confession;* and neither he nor Detective Roberts ever returned to the interrogation room saying they had spoken with Guidry's attorney and that he had authorized Guidry's cooperation.

*Sergeant Dan Billingsley*, the supervising detective on duty at the Sheriff's office the night of the interrogation, witnessed some of the confession. He testified that, although he was sure he knew Guidry had an attorney, he was not sure when he became aware of that fact.

### 2.

*At the 1996 (first) hearing*, *Gottlieb*, a lawyer unaffiliated with the Guidry case, gave the following testimony about a 15 March 1995 conversation in the chambers of a Texas state judge (approximately a week after the interrogation/confession). The

9

judge was not present; the following persons were:  Gottlieb; Guidry's two attorneys for the murder charge, Scott and Yarborough; Assistant District Attorney Rizzo; and two Harris County Sheriff's detectives.  During this conversation, one of the detectives remarked that he had been involved in obtaining Guidry's confession for the investigation of Farah Fratta's murder.

Scott and Yarborough, who had been appointed on or about that very day to defend Guidry on the murder charge, asked about the circumstances under which Guidry confessed.  Gottlieb testified about the detectives' response.

> Q.  Was there any discussion [by the detectives] about whether or not Howard Guidry had an attorney?
>
> ...
>
> A.  ... I think I said something to the effect that well, you know, he has an attorney on the aggravated robbery.  They said, *Yes, we talked to the attorney and got permission to talk to Mr. Guidry before we took him out to have his statement.  ...*
>
> [W]e all looked at each other in total and complete amazement ...
>
> I mean we were shocked that that would have occurred....
>
> That the lawyer gave them permission to talk to a man being accused of capital murder... [that a] defense attorney would even do that.  I mean I specifically remember elbowing ... Yarborough, going, Who is that [lawyer?]

(Emphasis added.)

10

*Duer, Guidry's robbery-charge-attorney*, also testified at the *1996 hearing*. According to his testimony: he told Guidry not to talk to any officers; he was never contacted by any detectives or by anyone else; and he never gave anyone permission to discuss any matter with Guidry.

Detectives Hoffman and Roberts and Sergeant Billingsley testified, as discussed *supra*, after Gottlieb and Duer at the 1996 hearing. At this point in the hearing, Guidry's murder-charge attorneys (Scott and Yarborough) realized that, because the detectives had contradicted Gottlieb's account of the 15 March in-chambers conversation, they (Guidry's murder-charge attorneys) would be required to testify about that conversation as participants in it. Therefore, they moved for a continuance so they could withdraw and new counsel could be appointed to represent Guidry. The motion was granted.

*At the 1997 hearing*, *Gottlieb* again testified regarding the 15 March in-chambers conversation. *Scott and Yarborough* also testified about it.

*Yarborough* testified that, the day before her testimony at the 1997 hearing, she had checked and determined that the State's case against Prystash was on the docket on the day of the 15 March in-chambers conversation (the reason for some or all of the persons being in the chambers). During that in-chambers conversation, according to Yarborough, Scott asked Detective Roberts why he

11

interrogated Guidry, obtaining a confession, when he knew Guidry had a lawyer, and Detective Roberts responded: "I talked to his lawyer, and his lawyer said it was okay to talk to him". Yarborough testified she was absolutely sure this is what Detective Roberts said, and that she had reacted with shock.

*Scott* testified as follows

> A. The response [from Detective Roberts and the other detective] was that they knew [Guidry] had an attorney at the time they took the statement, but they had checked with that attorney and got permission to go ahead and talk to Howard Guidry.
>
> Q. Now, just so that the record is clear. Did the officer indicate to you that he talked with the attorney on the aggravated robbery case and got permission to take the confession in the capital case?
>
> A. Yes, sir. He said that he knew [Guidry] had an attorney -- referring to the other attorney and that ... they had called and gotten permission from that attorney to talk to Mr. Guidry before they took the statement in the capital murder case.

The **Dissent** at 3 notes that Scott testified Detective Roberts might have been joking at the in-chambers conversation. This is a critical point. Indeed, Scott testified he had thought Roberts had been joking then; his opinion changed totally at the 1996 hearing when Roberts' testimony constituted a total denial of any in-chambers conversation, *not* that he had just been joking. Again, this is what caused Scott and Yarborough to realize at the 1996

12

hearing that they would have to withdraw as Guidry's counsel and testify.

*Scott and Yarborough* testified further:  they immediately determined that Duer had been Guidry's robbery-charge-attorney; and, when they contacted him, he stated he had never had any such conversation with the detectives.  As he had in 1996, *Duer* testified at the hearing in 1997 that "[n]o one has ever contacted me about speaking to Mr. Guidry".

Detective Roberts had testified at the start of the 1997 hearing.  He was recalled after Scott and Yarborough testified.  He was then questioned about this 15 March in-chambers conversation. *Detective Roberts testified he had no recollection of its having occurred.*

3.

The pre-trial suppression motion was denied orally on 20 February 1997.  Just before doing so, the state court stated that, for purposes of ruling on the admissibility of Guidry's confession, the 15 March in-chambers "conversation was absolutely meaningless, *except as it relate[d] to credibility*".  (Emphasis added.)

Concerning credibility, when the first lawyer (Gottlieb) testified at the 1996 hearing, the trial judge asked counsel for both sides if they waived her being sworn, noting that, although she had "not [been] a long time member of the bar", she was "experienced".  After counsel agreed to the waiver, the trial court

13

stated: "Ms. Gottlieb, we trust you". Thereafter, however, at the 1996 and 1997 pre-trial hearings and in the light of Gottlieb's testimony at the 1996 hearing about the 15 March 1995 in-chambers conversation, the lawyers testified under oath.

In admitting Guidry's confession at trial, the state court on 20 March 1997 summarized the testimony given by Gottlieb, Scott, and Yarborough about the 15 March 1995 in-chambers conversation. That summary reflected the critical nature of the testimony by those lawyers, including the crucial credibility question presented by the trial judge at the conclusion of the 20 February 1997 pre-trial suppression hearing. In ruling that the admissibility of Guidry's confession was a question for the court, not the jury, the state court did not comment, however, about the credibility of the testimony by Gottlieb, Scott, or Yarborough.

Post-verdict, the trial court on 27 March 1997 entered written findings of fact and conclusions of law concerning the confession, including the following:

> At all times Guidry advised [Detective] Tonry [a third detective] in Hoffman's presence that Guidry understood what his rights [were], *never requested to have an attorney*, never asked to call his attorney, never desired his attorney, never refused to discuss the case without his attorney.
>
> And, as a result, Guidry continued voluntarily discussing his complicity in the ... murder for hire with Detectives Hoffman and Tonry.

14

> ... [T]he statements were voluntarily made,
> not induced by force, threats or coercion, nor
> were any promises made, *nor was anything done*
> *to induce [Guidry] or cause [Guidry] to make*
> *anything but a knowing and intentional waiver*
> *of his rights and a free and voluntary*
> *decision to confess.*

(Emphasis added.)

These findings and conclusions, however, did *not* reconcile the testimony of Detectives Roberts and Hoffman with that of lawyers Duer, Gottlieb, Scott, and Yarborough. Indeed, notwithstanding the state court's above-discussed comments at the conclusion of the 1997 pre-trial suppression hearing and at trial, there was no mention of the lawyers' testimony from either of the two pre-trial evidentiary hearings, including the 15 March 1995 in-chambers conversation involving the detectives and the lawyers. With the exception of Guidry's testimony, the findings and conclusions did *not* evaluate the credibility of any defense testimony.

In evaluating Guidry's testimony, the trial court placed emphasis on Guidry's cooperation with law enforcement officers when Guidry had been arrested for other offenses, including for one offense for which he had claimed only to be the driver. (As noted *supra*, he had also made that claim in his initial confession concerning Farah Fratta's murder.)

> Guidry admitted to having made a confession to
> the police regarding the Klein Bank robbery
> prior to [the] March 7 [interrogation]
> mentioned above. Guidry also testified that
> as a 16 year old arrested for a number of
> burglaries he also confessed[;] additionally,

15

> Guidry had admitted to having confessed to certain other offenses (although not in writing) *and has admitted under oath to habitually being cooperative with police ... upon his arrest regarding his complicity in offenses.* Additionally, in another offense Guidry also claimed to *have been less culpable in that he was the driver as opposed to not being the trigger man* (a factor that did not go unnoticed by the trial Court in assisting its determination as to *Guidry's credibility and motive*).

(Emphasis added.)

## B.

Guidry's direct appeal to the Texas Court of Criminal Appeals raised 23 issues, including claims that: (1) the trial court's findings and conclusions failed to address conflicts in the evidence concerning the voluntariness of his confession; (2) it was obtained in violation of the Fifth Amendment because he invoked his right to counsel; and (3) Gipp's hearsay testimony was admitted in violation of his Sixth Amendment confrontation right.

Concerning the absence of findings on either conflicting testimony or inconsistencies in the testimony, the Court of Criminal Appeals held that, although TEX. CODE CRIM. PROC. art. 38.22 § 6 requires specific findings of fact when the voluntariness of a confession is raised, *see, e.g.,* **Hester v. State**, 535 S.W.2d 354, 356 (Tex.Crim.App. 1976), "the trial court's findings were sufficiently detailed". **Guidry I**, 9 S.W.3d at 142. It reasoned that the trial court is required to provide facts supporting its conclusions but is *not* required by Texas law to outline testimony

16

that *does not* support those conclusions. *Id*. In this light, the court rejected Guidry's Fifth Amendment claim, holding: "There is evidence in the record supporting these findings. Because the trial court is in the best position to evaluate the *credibility of the witnesses and their testimony*, we defer to the trial court's findings [that Guidry did *not* request his attorney]". *Id*. at 143 (emphasis added).

Concerning Gipp's testimony about Prystash's statements implicating Guidry in the murder, the Court of Criminal Appeals rejected Guidry's inadmissible-hearsay claim. Although it ruled that some of Gipp's hearsay testimony was admissible, the court held that her testimony relating to Prystash's statements against Guidry's interest was inadmissible. *Id*. at 149. Nevertheless, it held the admission of that testimony was harmless error because, given the strength of Guidry's confession and the other evidence, Guidry would have been convicted and sentenced in the same way, even without Gipp's inadmissible testimony. *Id*. at 152.

In May 2000, Guidry filed a habeas petition in state court raising, *inter alia*, Fifth and Sixth Amendment claims. That July, without an evidentiary hearing, the state habeas court adopted verbatim the State's proposed findings of fact and conclusions of law and recommended denial of Guidry's petition on all claims.

Unlike the trial court's findings, the state habeas court's findings included reference to Gottlieb's and Duer's testimony at

17

the 1996 evidentiary hearing. But, although the findings observe that the 1996 hearing was continued so that Scott and Yarborough (Guidry's then-counsel for the murder charge) could testify, they omit all reference to the 1997 pre-trial evidentiary hearing. Restated, there is no discussion of the testimony from the 1997 hearing, including by Scott and Yarborough. Moreover, there is no attempt to reconcile conflicting testimony between Detectives Roberts and Hoffman on the one hand and lawyers Duer, Gottlieb, Scott and Yarborough, on the other. Indeed, the findings make no credibility determinations; they do not weigh any witness' version of events against another's.

The state habeas court concluded: "[Guidry's] claims concerning the voluntariness of his statements were raised and rejected on direct appeal. As such, the issue need not be considered in the instant writ proceeding or in any subsequent proceedings". In the alternative, it concluded that Guidry had failed to show his confession violated his right against self-incrimination.

In November 2000, based on its review of the record, the Court of Criminal Appeals ruled that the habeas trial court's findings and conclusions were supported by the record. On that basis, it denied habeas relief.

Guidry filed his federal habeas petition in November 2001, raising four grounds for relief, including the Fifth and Sixth

18

Amendment claims at issue here.  In his petition, Guidry requested an evidentiary hearing.

In a joint answer and motion for summary judgment, the State did not explicitly address Guidry's request for an evidentiary hearing.  Instead, it provided, *inter alia*, a summary of AEDPA's standards for habeas relief as they related to Guidry's claims, including, pursuant to 28 U.S.C. § 2254(e)(1), the presumption of correctness to be accorded state court determinations of fact, unless rebutted by clear and convincing evidence, and how, pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing can be barred.

In an extremely detailed and comprehensive opinion, the district court denied the State's summary judgment motion and ordered an evidentiary hearing for the voluntariness *vel non* of Guidry's confession.  ***Guidry v. Cockrell***, No. H-01-CV-4140 at 9 (S.D.Tex. 11 Sept. 2002) (***Guidry II***).  Concerning both why summary judgment could not then be granted and why an evidentiary hearing was  required, the district court stated that the confession

> issue comes before the Court under the deferential review afforded state factual findings.  Such findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  Guidry may rebut the presumption of correctness by clear and convincing evidence.
>
> Having extensively reviewed the facts of this case, this Court is unable to grant Respondent's summary judgment motion at this time.  Substantial factual questions persist surrounding Guidry's confessions.  *The state courts made no attempt to evaluate the veracity*

19

> *of the attorney testimony or analyze its*
> *implication in this case.  The state courts*
> *made no specific finding with respect to the*
> *inconsistent and contradictory testimony by the*
> *police officers*.  If the allegations in
> Guidry's petition, as corroborated by the
> attorneys' testimony, are true, the
> reasonableness of the state court decision is
> suspect.  [*See* 28 U.S.C. § 2254(d), discussed
> *infra*.]  For this Court to fully evaluate the
> circumstances surrounding this claim, further
> factual development is appropriate.  Factual
> development would aid this Court in determining
> whether clear and convincing evidence rebuts
> the trial finding that Guidry did not request
> counsel.  Also, the factual development would
> clarify the ultimate question of the
> reasonableness of the state court's
> determination.  *See* **Valdez v. Cockrell**, 274
> F.3d 941, 952 (5th Cir. 2001) ("When a district
> court elects, in instances *not barred by §*
> *2254(e)(2)*, to hold an evidentiary hearing, the
> hearing may assist the district court in
> ascertaining whether the state court reached an
> unreasonable determination under either §
> 2254(d)(1) or (d)(2).").  To that end, the
> Court will hold an evidentiary hearing limited
> to the issue of Guidry's Fifth Amendment claim.

*Id*. at 12-13 (emphasis added; footnote omitted).  Concomitantly, the

district court ruled that an evidentiary hearing was *not* barred by

28 U.S.C. § 2254(e)(2), discussed *infra*.  **Id**. at 13 n.12.

The State did not file a motion seeking to have the district

court reconsider its decision to conduct an evidentiary hearing.

Nor did it oppose Guidry's motion for a continuance of that hearing

from 1 November 2002 to 13 December 2002.

At the hearing, Guidry and lawyers Duer, Gottlieb, Scott, and

Yarborough gave substantially the same testimony they had given in

20

the state pre-trial evidentiary hearings. Similarly, Detective Hoffman gave the same testimony, adding that he had never been in the chambers where the 15 March 1995 conversation took place. Sergeant Billingsley also provided substantially the same testimony.

On the other hand, Detective Roberts' testimony, although similar in most respects to his previous testimony, included some significant differences: at the time of Guidry's interrogation on 7 March 1995, he did *not* know Guidry had an attorney; he *did* recall the 15 March 1995 in-chambers conversation (*a direct contradiction of his 1997 pre-trial testimony*); and he never told Scott in that conversation that he had contacted Duer, Guidry's robbery-charge attorney. *For the first time*, Detective Roberts testified, on direct examination, that, prior to questioning Guidry, he had contacted an attorney — Assistant District Attorney Wilson — to ask if he could question Guidry about the murder, because he knew that, based on Guidry's having been in jail several days on another charge, he probably had an attorney.

> Q    Let me back up just a little bit. I am sorry. Prior to interviewing Mr. Guidry, did you contact any attorney?
>
> A    Yes, I did.
>
> Q    Who did you contact?
>
> A    I contacted Ted Wilson with the Harris County District Attorney's Office.
>
> Q    Why did you contact Mr. Wilson?

21

A     Just to ask him if there was a problem with me talking to Howard Guidry concerning this capital murder.

Q     And why did you think there might be a problem with talking to him?

A     *I knew he had been in jail for several days; and usually after a suspect has been in jail for two or three days, an attorney is appointed to them in most cases.*

Q     So you knew it was possible that he might have an attorney?

A     *It was possibly that he may have an attorney, and I wanted to make sure there wasn't a conflict, there was no problem.*

(Emphasis added.)  Along this line, on cross-examination, Detective Roberts testified that Guidry *may* have told him during the interrogation that he *did* have an attorney.

In September 2003, the district court granted conditional habeas relief on Guidry's claims under the Fifth Amendment (involuntary confession) and Sixth Amendment (improper hearsay testimony).  ***Guidry v. Dretke***, No. H-01-CV-440 (26 Sept. 2003) (***Guidry III***).  In so doing, the district court stayed its judgment pending appeal.

                                        II.

At issue is whether the district court reversibly erred:  (1) by conducting an evidentiary hearing on Guidry's confession, in the light of the state court's having held one for that issue and, according to the State, for the same evidence and in order to substitute its credibility determinations for those by the state

22

court; (2) by ruling on that confession issue that, pursuant to 28 U.S.C. § 2254(e)(1), Guidry, with the requisite clear and convincing evidence, rebutted the presumption of correctness AEDPA accords to state court determinations of fact; and (3) by ruling that the admission of the confession and the hearsay testimony against Guidry's interest was *not* harmless error. We hold that the district court applied AEDPA properly both in conducting the hearing and in granting Guidry conditional habeas relief.

## A.

"AEDPA's purpose [is] to further the principles of comity, finality, and federalism." ***Michael Williams v. Taylor***, 529 U.S. 420, 436 (2000). Toward that end, its enactment in 1996 effected considerable limitations on federal habeas review. That change, however, does not compel the narrow reading given AEDPA by the State (and the dissent) in regard to the district court's conducting an evidentiary hearing and applying 28 U.S.C. § 2254(e)(1).

## 1.

The trial court held pre-trial evidentiary hearings in 1996 and 1997 on the voluntariness *vel non* of Guidry's confession; the state habeas court did not conduct a hearing; and the district court held an evidentiary hearing on the same issue in 2002. The State does *not* contend that AEDPA expressly bars the district court hearing;

23

instead, consistent with the abuse of discretion standard of review for this issue, it contends that the district court abused its discretion by conducting the hearing. *See, e.g., **Valdez v. Cockrell***, 274 F.3d 941, 948, 952 (5th Cir. 2001), *cert. denied*, 537 U.S. 883 (2002); ***Barrientes v. Johnson***, 221 F.3d 741, 770 (5th Cir. 2000) (citing ***McDonald v. Johnson***, 139 F.3d 1056, 1059-60 (5th Cir. 1998)).

a.

According to the State, the district court hearing permitted the district court improperly to substitute its credibility determinations for those by the state court, contravening AEDPA's policy goals. Citing ***Pondexter v. Dretke***, 346 F.3d 142, 147-49 (5th Cir. 2003), and ***Self v. Collins***, 973 F.2d 1198 (5th Cir. 1992) (pre-AEDPA), the State observes correctly (as does the dissent) that, in reviewing a state court decision, a federal habeas court is prohibited from substituting its credibility rulings for those by the state court simply because the district court disagrees with them.

Claiming erroneously that the same evidence was presented at the district court hearing in 2002 as at the earlier state court pre-trial hearings in 1996 and 1997 (the same witnesses providing the same testimony), the State presents a narrow claim concerning the district court's discretion to conduct the evidentiary hearing: where there will be no new evidence, and the federal habeas court

24

intends only to make new credibility rulings regarding existing evidence, conducting an evidentiary hearing is an abuse of that discretion. The State objects to the district court's, in this fashion, evading its deferential obligations and the constraints placed on its discretion by AEDPA. *See **Villafuerte v. Stewart***, 111 F.3d 616, 633 (9th Cir. 1997) (not abuse of discretion to deny an evidentiary hearing where district court asked to hear "the same evidence heard by the state court in the state habeas proceeding. This is not a valid reason for an evidentiary hearing in district court").

The State offers no direct authority, however, for restricting the district court's discretion in this fashion. Instead, it contends that the restriction is consistent with AEDPA's purpose and principles. In this regard, the State seems to claim that AEDPA limits a federal habeas court's discretion to conduct an evidentiary hearing to those instances in which the facts were *not* fully developed in state court.

i.

Based on our review of the record, it is arguable that the State did not properly preserve this narrow issue in district court. Guidry does not claim this issue is raised for the first time on appeal. On the other hand, no authority need be cited for the rule that we, not the parties, select the appropriate standard of review, including whether an issue will even be addressed if not raised in

25

district court. *See* **McLuckie v. Abbott**, 337 F.3d 1193, 1200 n.3 (10th Cir. 2003) (refusing to address whether lack of evidentiary hearing was proper when no objection to its absence at district court habeas review).

Guidry's habeas petition requested an evidentiary hearing, and the district court ordered one in conjunction with denying the State's summary judgment motion. In neither instance did the State object to an evidentiary hearing; it certainly did *not* present the narrow hearing-is-prohibited issue it raises now. At most, an implied objection is perhaps presented in its joint answer to Guidry's habeas petition and summary judgment motion, concerning: pursuant to AEDPA, the deference due state court decisions and when an evidentiary hearing is expressly barred; and its summary judgment request.

Obviously, this issue should have been presented expressly and fully to the district court, especially when, on denying summary judgment, it ordered an evidentiary hearing. Had the issue been so presented, the record would be far better developed for our review; judicial efficiency and economy, far better served.

The State's discussion, in its joint answer to Guidry's habeas petition and summary judgment motion, concerning the AEDPA-mandated deference to state court decisions and when an evidentiary hearing is expressly barred by AEDPA, falls short of presenting adequately to the district court the narrow issue raised now concerning whether

26

the district court abused its discretion by conducting the evidentiary hearing. Likewise, the summary judgment request is silent on that question. On the other hand, it might be contended that the narrow abuse of discretion issue was not fully developed until the evidence was presented at the hearing and the district court ruled. From this perspective, only then did the State have all of the claimed components for the narrow issue it presents.

In any event, the issue's not being fully preserved may have been because, despite the petition's requesting an evidentiary hearing, the decision to conduct one appears to have been *sua sponte*, consistent with AEDPA and Rule 8 of Rules Governing Section 2254 Cases in the United States District Courts, discussed *infra*. In ordering the hearing, the district court did not mention Guidry's request for an evidentiary hearing. Nor did Guidry mention that request in his opposition to summary judgment.

Along this line, no authority need be cited for the well-established rule that, after conditional habeas relief was granted, the State was *not* required to move the district court to reconsider its having ordered the hearing in order for the State to preserve this narrow issue for review. Accordingly, based on our review of the record, and especially because the narrow issue arose for the most part, if not totally, through the district court's *sua sponte* exercise of its discretion to conduct the evidentiary hearing, we will consider it.

27

As we understand the State's narrow challenge to the evidentiary hearing's being held, it is premised in large part on the same evidence being presented in that hearing that was presented in the two pre-trial hearings in state court on the motion to suppress Guidry's confession. Had this narrow issue been presented to the district court upon its ordering the hearing to be held, the district court could have decided whether it had merit. (Likewise, the **Dissent** at 1 maintains "the district court ... [held] an evidentiary hearing to rehear the same testimony heard by the state court". This is not so.) In any event, although the same witnesses testified in district court as in state court, there was no way, of course, for the district court to know whether testimony at the federal hearing would be identical to that at the state hearings, even if the same witnesses were to be called. This is demonstrated vividly by how Detective Roberts' testimony changed.

Because of the belated manner in which the issue has been raised (post grant of conditional habeas relief), a far different scenario exists. As discussed, although the evidence at the district court hearing was, in most respects, the same as at the state hearing, there were some significant differences. For example, Detective Roberts testified at the district court hearing that: prior to questioning Guidry on 7 March 1995, he contacted an assistant district attorney to ensure there would be no conflict in

his doing so because Detective Roberts knew that, for persons in Guidry's circumstances (in jail for several days on another charge (bank robbery)), "usually ... an attorney is appointed [for] them"; nevertheless, for the 7 March interrogation of Guidry, he did *not* know Guidry had an attorney. As another example, Detective Roberts did recall the 15 March 1995 in-chambers conversation.

Accordingly, the factual prong for the State's narrow issue fails: the evidence was *not* the same. Arguably, therefore, there is no merit to this issue. On the other hand, the State may be contending that, as a matter of law, the hearing should not have been held because, when the district court ordered the hearing in conjunction with denying the State's summary judgment motion, the district court knew the same witnesses would testify at that hearing as had testified in state court; that, without more, the district court was required to accept the state trial court's implied credibility rulings.

In *Guidry II* at 12-14, the district court explained in great detail why, notwithstanding the AEDPA-mandated deference owed the state court decision, it could not, pursuant to AEDPA, determine whether that decision was unreasonable without first conducting an evidentiary hearing to test the state court decision. In that regard, in the light of the summary judgment record, the district court made the following observations about the State's summary judgment motion and the state court suppression hearings:

[The State] argues that the testimony from the [15 March in-]chambers episode is not as beneficial as anticipated by Guidry's claim. [The State] focuses on three main factors: (1) the police denied making the [in-chambers] statements; (2) if the episode in chambers indeed occurred, the motive behind the [in-chambers] statement is unclear; and (3) the [in-chambers] statement does not prove that Guidry invoked his right to counsel. These factors, however, do not detract from the strength of Guidry's assertion. First, while Detective Roberts testified that no one made the [in-chambers] statement in question, *three members of the bar testified otherwise*. Detective Roberts' testimony in that respect is suspect. This is especially the case as Detective Roberts gave contradictory and inconsistent testimony on other grounds. Second, the fact that the motive behind the [in-chambers] statement is unclear highlights the inadequacies of the state review. *Respondent's attempt to characterize the [in-chambers] statement as a joke is pure speculation*, accentuating the need for factual development. It is especially difficult to ascertain Detective Roberts' motive from the record because he emphatically denied making any such statement in chambers. Tr. vol. 7 at 203. Finally, while the officer making the [in-chambers] comment did not expressly say that Guidry had invoked his right to counsel, the Court cannot turn a blind eye to the fact that the comment is based on the assumption that Guidry asked to speak to counsel. *The police would have no need to concoct a story about getting an attorney's permission to speak with a client if Guidry did not request counsel's assistance. The [in-chambers] comment by the police does more than enhance Guidry's credibility and detract from their own, it shows that the police potentially ignored Guidry's right to counsel.*

*Id*. at 13-14 (emphasis added). (The above demonstrates vividly why

the district court felt a hearing necessary; obviously, it felt it

30

could offer far more than, in the dissent's words, "little aid in determining whether the trial court's factual determination was unreasonable in light of the evidence presented". **Dissent** at 4.)

Accordingly, in the light of this record, we turn to the district court's authority to conduct the evidentiary hearing. The State does not challenge a district court's discretion to conduct an evidentiary hearing, so long as it is not violative of the constraints imposed by AEDPA. Instead, the State claims the district court abused that discretion, especially concerning the state court's credibility determination.

### iii.

In the light of the narrow issue presented by the State, it is not necessary to discuss pre-AEDPA jurisprudence in detail in order to understand AEDPA's constraints on a federal habeas court's discretion to conduct an evidentiary hearing. Well in advance of AEDPA's enactment in 1996, **Townsend v. Sain**, 372 U.S. 293 (1963), *overruled by* **Keeney v. Tamayo-Reyes**, 504 U.S. 1 (1992), had delineated the boundaries of a federal habeas court's authority and obligation to conduct evidentiary hearings. The Court determined the circumstances under which federal habeas courts had discretion to do so, as well as when they were *required* to do so. It held a federal habeas court *must* conduct an evidentiary hearing if

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding

31

procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Id*. at 313.  The Court stated that a district court had discretion to conduct an evidentiary hearing in any case, even when none of the above circumstances was present.  *Id*. at 318.

Former 28 U.S.C. § 2254(d) attempted to codify the dictates of *Townsend*.  *See* 28 U.S.C. § 2254(d)(1994); *see also* **Miller-El v. Cockrell**, 537 U.S. 322, 358-59 (2003) (Thomas, J., dissenting); **Valdez**, 274 F.3d at 948-50; **Joyner v. King**, 786 F.2d 1317, 1321-22 (5th Cir.), *cert. denied*, 479 U.S. 1010 (1986).  In contrast to former § 2254(d), AEDPA greatly curtailed federal habeas court discretion to conduct evidentiary hearings.  Express restrictions are found at 28 U.S.C. § 2254(e)(2).

> *If the applicant has failed to develop the factual basis of a claim in State court proceedings*, the court shall *not* hold an evidentiary hearing on the claim *unless* the applicant shows that —
>
> (A)  the claim relies on —
>
> (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

32

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added). Understandably, this standard is almost identical to the one a petitioner must satisfy to be permitted to file a second or successive habeas application under § 2254. *See* 28 U.S.C. § 2244(b)(2). Subpart (e)(2) is recognized as a "dramatic[] restric[tion]" on "the ability of district courts to hold an evidentiary hearing". *Spreitzer v. Schomig*, 219 F.3d 639, 648 n.1 (7th Cir. 2000), *cert. denied*, 532 U.S. 925 (2001).

Pursuant to its plain language, subpart (e)(2)'s hearing-bar applies, however, only if a habeas petitioner failed in state court "to develop the factual basis" for his claim. Moreover, "[u]nder the opening clause of [subpart](e)(2), a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel". *Michael Williams*, 529 U.S. at 432; *see also Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir. 2000). Restated, if a petitioner develops a factual basis for a claim in state court (or sufficiently attempts to do so), subpart (e)(2) does *not* bar an evidentiary hearing in district court.

Guidry requested, and received, an evidentiary hearing in state court and provided ample evidence, to say the least, for the factual

33

basis for his Fifth Amendment claim.  Testimony at the pre-trial hearings — Guidry's and that of four lawyers — more than adequately developed that factual basis.  Therefore, subpart (e)(2) did *not* bar the evidentiary hearing in district court.  The State conceded this at oral argument here.

As noted, the dissent maintains the district court abused its discretion in holding an evidentiary hearing because it did not intend to hear "new evidence", **Dissent** at 4, so there was "no justification" for its holding a new hearing, *id*. at 5.  Where subpart (e)(2)'s bar does not apply, Rule 8 of the Rules Governing Section 2254 Cases in the United States District Courts grants district courts the very discretion the dissent would proscribe. The version of Rule 8 in effect when the hearing was granted provided:

> If the petition is not dismissed at a previous stage in the proceeding, the judge, after the answer and the transcript and record of state court proceedings are filed, shall, upon a review of those proceedings *and of the expanded record, if any, determine whether an evidentiary hearing is required*. If it appears that an evidentiary hearing is *not* required, the judge shall make such disposition of the petition as justice shall require.

Rule 8(a) (emphasis added).  The amendment to Rule 8(a), effective 1 December 2004, makes no substantive change.  The amended Rule provides:

> If the petition is not dismissed, the judge must review the answer, any transcripts and records of state-court proceedings, and any

34

> materials submitted under Rule 7 [allowing district judge to "direct the parties to expand the record by submitting materials relating to the petition"] to determine whether an evidentiary hearing is warranted.

Post-AEDPA, Rule 8(a) has been interpreted to vest district courts with discretion to conduct an evidentiary hearing if not barred by subpart(e)(2). *See Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir.), *cert. denied* 531 U.S. 957 (2000); *Clark v. Johnson*, 202 F.3d 760, 765 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).

Our court has remanded to district court, with instructions to conduct an evidentiary hearing, *despite the state court's having held one*. *See Barrientes*, 221 F.3d at 770 (agreeing with State that district court abused its discretion by granting habeas relief *without* conducting evidentiary hearing where it "lacked sufficient *undisputed* facts to make an *informed* decision" (emphasis added)). And, in at least one instance, the State has *not* challenged the federal habeas court's discretion to conduct an evidentiary hearing, despite the state habeas court's having held a hearing involving the same issue and nearly identical evidence. *See Valdez*, 274 F.3d at 948, n.13 (in the light of *Michael Williams*, State abandoned its initial contention that the district court abused its discretion in conducting evidentiary hearing: "The Director asserts that ... the district court had the discretion to hold an evidentiary hearing....").

The restriction imposed by subpart (e)(2) evinced a "Congress[ional] intent to avoid unneeded evidentiary hearings in federal habeas corpus". *Michael Williams*, 529 U.S. at 436. Noticeably absent from AEDPA's restrictions, however, is the one proposed by the State for this case. Instead, read in conjunction with Rule 8(a), subpart (e)(2) implies a federal habeas court has discretion to conduct an evidentiary hearing where none of the bars apply.

The State concedes that those bars did not apply to Guidry's claim. The district court decided an evidentiary hearing was required because: (1) testimony by Guidry and four lawyers — three of whom had served as assistant district attorneys — formed the basis for a constitutional claim that, if true, might entitle Guidry to relief; (2) gaps, inconsistencies, and conflicting testimony were not explained, or even mentioned, in the trial court's findings of fact and conclusions of law; and (3) these omissions reflected the trial court's failure to make crucial credibility determinations. These quite legitimate concerns about conflicting evidence permitted the district court, within AEDPA's boundaries, to investigate those conflicts so that it could rule properly on the habeas petition.

b.

In deciding this issue, we do consider implied credibility determinations by the state court, as discussed *infra*. The implied determination here, however, is that four lawyers testified falsely.

This conclusion is too extraordinary to avoid development through an evidentiary hearing in district court.

Alternatively, the trial court's implicit finding may instead be:  for the 15 March in-chambers conversation, the four lawyers told the truth but Detective Roberts lied; but, for the 7 March confession, Detective Roberts told the truth, but Guidry lied.  In the light of this record, it is this type of speculation — made necessary when findings on crucial issues are "implied" — that demonstrates the need for explicit state court findings in this case.  The district court did not abuse its discretion in conducting the evidentiary hearing.

2.

Under AEPDA, for a "claim that was adjudicated on the merits in State court proceedings", habeas relief will not be granted unless the state court's "adjudication of the claim — "

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was *based on an unreasonable determination of the facts* in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2)(emphasis added). Such "determination of the facts" by the state court "shall be presumed to be correct"; the habeas petitioner "shall have the burden of rebutting the

presumption of correctness by clear and convincing evidence". 28 U.S.C. § 2254(e)(1).

The State claims: the district court erroneously applied § 2254's subpart (e)(1) (presumption of correctness to be accorded a state court's "determination of a factual issue" unless "rebutt[ed] ... by clear and convincing evidence") in not accpeting the trial court's determinations of the facts; and this caused the district court not to accord the deference required by AEDPA under § 2254's subpart (d)(2) (whether the state court's decision "was based on an unreasonable determination of the facts"). (The State does not claim, in the alternative, that, even if the district court's subpart (e)(1) ruling is correct, its subpart (d)(2) ruling was incorrect. Therefore, that question is not before us.)

Pursuant to subpart (e)(1), the district court found the presumption of correctness rebutted by clear and convincing evidence (did not accept) for at least the following two trial court findings concerning the 7 March 1995 interrogation: that Guidry did *not* ask for his attorney; and that the detectives did *not* inform Guidry that his attorney gave Guidry permission to discuss the case with them. These non-accepted state court findings necessarily rest on several credibility determinations. In its findings and conclusions, the trial court found Guidry was *not* credible but the detectives were. But, again, the trial court was silent with respect to the testimony by the four lawyers who testified on Guidry's behalf. The State

38

characterizes this silence, viewed in the context of the trial court's findings and conclusions as a whole, as "implied" credibility determinations against those lawyers. Citing **Galvan v. Cockrell**, 293 F.3d 760, 764 (5th Cir. 2002) (holding federal court defers to trier of fact for credibility determinations), the State claims AEDPA proscribes the district court's non-acceptance of the trial court's express and implied credibility determinations and of other trial court findings of fact.

The State maintains: contrary to subpart (e)(1), the district court erred in not according the state trial court's findings the requisite presumption of correctness to which they were entitled because the four lawyers' testimony cannot be the requisite clear and convincing evidence for rebutting that presumption. The State bases this on its assertion that the evidence found clear and convincing by the district court is, according to the State, essentially the same evidence that was provided — unsuccessfully — in state court. Therefore, again according to the State, the district court effectively substituted its credibility determinations for those of the state trial court. As discussed, a federal habeas court is prohibited from doing this simply because it disagrees with the state court's determinations. *See* **Pondexter**, 346 F.3d at 148. (The **Dissent** at 4-5 errs in suggesting we do not employ this rule.) Before considering the findings by the state

trial court, explanation is required for why we do *not* consider those by the *state habeas court*.

In July 2000, in adopting verbatim the State's proposed findings of fact and conclusions of law, the *state habeas court* made *alternative* findings of fact and conclusions of law concerning the confession's admissibility. Neither the State nor Guidry analyzes these alternative findings of fact and conclusions of law, nor does the district court mention them in its opinion. Instead, the focus is on the *trial court's* March 1997 written findings and conclusions. Possibly, this is because we can ignore the state habeas court's findings on the confession issue; as that court ruled, state law barred it from considering the issue because it had been addressed on direct appeal. "The general doctrine ... forbids an application for a writ of habeas corpus after direct appeal has addressed an issue." *Gill v. State*, 111 S.W.3d 211, 214 n.1 (Tex.App. – Texarkana 2003) (holding this general rule does not apply to ineffective assistance of counsel claim).

In any event, the state habeas court's findings did *not* conflict with the state trial court's. Although the state habeas court's findings added a summary of Gottlieb's and Duer's testimony at the 1996 hearing, they included *no* evaluation of that testimony, *no* credibility determinations, and *no mention of the testimony at the 1997 hearing*. Because the state habeas court's findings were

40

in the alternative, and because that court reached the same legal conclusion as did the state trial court and did *not* make any conflicting findings or determinations, the state trial court's findings of fact control. *Cf.* **Walbey v. Dretke**, 100 Fed. Appx. 232, 235 (5th Cir. 2004) (unpublished) (holding state habeas court's "factual findings did not survive [state habeas] appellate review, so that the district court did not err when it failed to defer to those findings in denying habeas relief", where the state habeas appellate court (1) failed to adopt the habeas court's findings and (2) those findings were *directly inconsistent* with the appellate court's). Therefore, the district court was correct to focus on the state trial court's determinations of fact.

### b.

When a district court considers whether to accept a state court's determinations of fact, including credibility determinations, it must act, of course, in accordance with "the respect due state courts in our federal system". **Miller-El**, 537 U.S. at 340. For state court determinations of fact, this deference is embodied in subparts (d)(2) and (e)(1). The State's challenge is to the district court's application of subpart (e)(1) (state court determinations of fact presumed correct unless rebutted by clear and convincing evidence). Under subpart (d)(2), a state court decision may be overturned on factual grounds only if its determinations of fact are "objectively unreasonable in the light

41

of the evidence presented in the state-court proceeding". *Miller-El*, 537 U.S. at 340 (citing *Terry Williams v. Taylor*, 529 U.S. 362, 399 (2000) (opinion of O'Connor, J.)).

Again, the dissent mistakenly views our position as being contrary to the well-established rule that the district court may not substitute its own credibility determinations for those of the state court simply because it disagrees with the state court's findings. Notwithstanding AEDPA's requiring substantial deference for state court determinations of fact, such

> deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court *can disagree with a state court's credibility determination* and, when guided by AEDPA, conclude [under subpart (d)(2)] the decision was unreasonable or that [under subpart (e)(1)] the factual premise was incorrect by clear and convincing evidence.

*Id*. (emphasis added). Consistent with this scheme, and pursuant to subpart (e)(1), the district court did not accept the state court's determinations of fact because the trial court made *no* findings on considerable evidence critical to Guidry's claim. *Guidry III* at 12-15. Consequently, under subpart (d)(2), the district court concluded the trial court's decision "was based on an unreasonable determination of the facts". *Id*. at 15 (citing *Wiggins v. Smith*, 539 U.S. 510, 528 (2003)).

Guidry has challenged the state court's failure, through express determinations of fact, including credibility

42

determinations, to resolve evidentiary conflicts that are crucial to his claim. According to the dissent, the district court must defer to trial court factual determinations, even when they are presented without explanation concerning extremely important and conflicting evidence. On the contrary, certainly on this record, such absence suggests an unreasonable determination; the district court was required to review the underlying facts, even though they were adduced at a full and fair hearing. Contrary to the dissent, we certainly do *not* suggest "that a habeas petitioner can satisfy his burden under subpart (e)(1), and thereby discredit the state court's factual finding, merely by pointing to a failure by the trial court to make explicit credibility findings regarding particular witnesses". ***Dissent*** at 1-2.

Again, in its written findings, the trial court weighed Guidry's testimony against the testimony of Detectives Roberts and Hoffman and Sergeant Billingsley; but, it omitted the testimony of four lawyers — Duer, Gottlieb Scott, and Yarborough — that corroborated Guidry's. The lawyers' testimony is crucial for determining whether Guidry asked for his attorney and whether the detectives stated falsely that they had spoken with that attorney and he had stated Guidry could talk with them. The district court did not err in its application of subpart (e)(1).

The state trial court's omission, without explanation, of findings on evidence crucial to Guidry's habeas claim, where the

43

witnesses are apparently credible, brought into question whether, under subpart (d)(2), its "decision ... was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding". After reviewing the demeanor of Detectives Roberts and Hoffman at the 2002 hearing, and finding them not credible, while observing the credible testimony of the four lawyers and Guidry, the district court, pursuant to subpart (e)(1), was in an even better position not to accept the trial court's findings.

B.

The district court's findings of fact are reviewed only for clear error; its conclusions of law and rulings on mixed issues of law and fact, *de novo*. *E.g., **Valdez***, 274 F.3d at 946. Again, the district court granted two of Guidry's claims: (1) his confession was obtained in violation of his Fifth Amendment right against self-incrimination; and (2) Gipp's hearsay testimony against Guidry's interest violated his Sixth Amendment confrontation right.

1.

The district court found: Guidry invoked his right to counsel during his interrogation by Detectives Roberts and Hoffman; and the detectives induced Guidry's confession by telling him, falsely, that they had spoken to his robbery-charge-attorney, Duer, and that Duer had authorized Guidry's cooperation without Duer's being present. ***Guidry III*** at 14-15. The State contends these findings are clearly

44

erroneous because they rely on identification testimony from the lawyer witnesses that is ambiguous at best.

There were discrepancies in the lawyers' testimony regarding the identity of the detectives participating in the 15 March 1995 in-chambers conversation. *At the 1996 pre-trial hearing*, Gottlieb stated that, before 15 March, she had never seen the detectives present during that in-chambers conversation and did not know their names. And, when Detectives Roberts and Hoffman were brought into the courtroom during that hearing in 1996, she identified the "bigger of the two", Detective Hoffman, as the person making the in-chambers comments about Guidry's interrogation. (Detective Hoffman testified at the district court hearing in 2002 that he had never been in those chambers.) *Gottlieb testified differently at the 1997 pre-trial hearing*, stating that she did not remember which detective made the in-chambers comments, but that she thought it was the "short one" (Detective Roberts). Moreover, at that hearing, Scott and Yarborough identified Roberts as the detective involved in the conversation. Yet, the State points out, neither knew Detective Roberts' name at the time of the conversation and identified him only after he was singly brought into the courtroom. Further, the witnesses were unsure about the identity of the other detective present during the in-chambers conversation.

45

a.

Although the 1996 and 1997 pre-trial hearings provided the factual basis for Guidry's claim (preventing subpart (e)(2) from barring the 2002 district court evidentiary hearing), the district court's credibility determinations were made on the basis of the 2002 testimony, after the court had the opportunity to observe and evaluate witness demeanor and credibility. *Guidry III* at 13-14. The district court noted numerous contradictions in Detective Roberts' testimony during the 2002 hearing and conflicts between testimony from different hearings. For example, Detective Roberts testified at the 1997 pre-trial hearing that he had *not* been present at the 15 March in-chambers conversation; *at the 2002 hearing, however, he acknowledged being present*, but claimed he could *not* remember the conversation. Detective Roberts offered conflicting testimony at each hearing regarding when, and whether, he knew Guidry had an attorney for the robbery charge. And, as noted, at the district court hearing, he testified for the first time about contacting an assistant district attorney, *prior to questioning Guidry*, because he realized, based on Guidry's having been in jail for several days, that he probably had a lawyer.

After reviewing the record and the witnesses' testimony ("particularly their demeanor"), the district court ruled that the detectives were *not* credible, but the lawyer witnesses and Guidry were. It was well aware of the conflicts in the testimony noted by

the dissent.  The court found that Guidry had invoked his right to counsel, and that the detectives had told him, untruthfully, that they had contacted his attorney, who had approved Guidry's cooperation.  Again, the court was aware of ambiguities in the lawyers' testimony identifying Detective Roberts as the detective present for the in-chambers conversation; but, these ambiguities were resolved when, at the district court hearing, Detective Roberts *admitted* to being present in those chambers.  These findings are *not* clearly erroneous.

b.

*Edwards v. Arizona*, 451 U.S. 477, 484 (1981), provides the bright-line rule for applying the Fifth Amendment to the confession claim:  when an accused expresses his desire to speak to police only through counsel, he is not subject to further interrogation until counsel is made available to him, unless the accused initiates further communications with the police.  In reviewing whether a waiver of this Fifth Amendment right is knowing and voluntary, a court must assess whether:  it was the product of intimidation, coercion, or deception; and it was made with full awareness of one's constitutional rights.  *See* *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

The district court ruled that Guidry invoked his Fifth Amendment right by asking, twice, to speak to his attorney.  And, as the district court noted, although Guidry later signed and

47

initialed a waiver of his rights, and received a recitation of his *Miranda* rights in a subsequent videotaped walk-through of the crime scene,

> those events occurred *after* Guidry invoked his right to counsel, and, according to his credible testimony, only *because* Guidry believed counsel had advised him to speak freely with police. The police deception caused Guidry to waive his rights under a misapprehension of the full circumstances surrounding that waiver.

*Guidry III* at 16 (emphasis in original).

The district court concluded correctly that, under these circumstances, Guidry's confession was *not* voluntary and that the state trial court erred by not suppressing it. Therefore, pursuant to 28 U.S.C. § 2254(d)(2), the district court concluded properly that the state court's adjudication of the claim was based on an unreasonable determination of the facts. (The State contends that, even if the confession should have been excluded, its admission was harmless error. We disagree, as discussed *infra*.)

2.

On direct appeal, the State conceded that Gipp's testimony included hearsay (statements by Prystash) but urged it was admissible. *Guidry I*, 9 S.W. 3d at 147. Part of Gipp's hearsay testimony concerned the following statements by Prystash against Guidry's interest: Prystash was going to take Guidry to the Frattas' home on the night of the murder; Prystash and Guidry killed Farah Fratta; Guidry shot her in the head as she exited her vehicle;

48

after the murder, Prystash picked Guidry up in Prystash's automobile; after the murder, Guidry was to receive $1000 for the murder; and, on the night of the murder, Prystash was to obtain that $1000 for Guidry from Robert Fratta.

The district court granted habeas relief on Guidry's claim that Gipp's repeating these statements by Prystash violated Guidry's Sixth Amendment confrontation right. *Guidry III* at 20. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. Admission of hearsay statements of the type at issue violates this clause unless the witness is unavailable and the defendant had prior opportunity to cross examine him. *Crawford v. Washington*, 124 S. Ct. 1354, 1365–66 (2004).

a.

On direct appeal, the Court of Criminal Appeals held that Prystash's statements against Guidry's interest, admitted through Gipp, were *not* admissible. *Guidry I*, 9 S.W. 3d at 149. It held: those statements did not fall within a hearsay exception; and it was "doubtful [they] possessed 'particularized guarantees of trustworthiness' sufficient to overcome the presumption of hearsay unreliability". *Id*. at 151.

The district court agreed with this holding by the Court of Criminal Appeals: Prystash had "every reason" to attempt to spread the blame for Farah Fratta's death and inculpate Guidry in the

49

murder-for-hire.  *Guidry III* at 22.  The district court concluded:

> Importantly, the record gives no particular basis upon which to gauge Prystash's credibility when he made those statements. This Court will not upset the holding of the Court of Criminal Appeals that Gipp's hearsay-laden testimony inculpating Guidry in the murder violated the Confrontation Clause.

*Id*.  Particularly in the light of the Supreme Court's recent decision in *Crawford*, the district court's conclusion regarding the inadmissibility of Prystash's challenged statements was correct.

b.

Unlike the Court of Criminal Appeals, however, the district court held admission of this hearsay testimony by Gipp was *not* harmless error.  Guidry's confession having been excluded by the district court, there was scant evidence to support his conviction, other than Prystash's statements admitted through Gipp.  And, other than those statements, there was *no* evidence showing Guidry killed Farah Fratta for remuneration — the capital offense for which Guidry was convicted.  *Id*.  The district court concluded:  because the hearsay testimony "served as an indispensable piece of evidence to convict Guidry of capital murder", it "had both a substantial and an injurious effect in determining the jury's verdict".  *Id*. (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The State contends the admission of both the hearsay testimony and the confession was harmless error, claiming the remaining evidence is sufficient to establish Guidry's role in the murder:

50

two neighbors testified that they saw a black male (Guidry is black) dressed in black clothing in the Frattas' garage just after the shooting; one neighbor testified that this person left the scene in a vehicle matching the description of Prystash's automobile; when Guidry was arrested in early 1995, the murder weapon was in his possession; and, when the police searched Robert Fratta's vehicle, they discovered an address book with Gipp's telephone number and an unmarked envelope containing $1050.

Along this line, in her admissible testimony, Gipp testified: Guidry lived in an apartment next to hers, and they shared a staircase and landing; Prystash was her boyfriend; Guidry and Prystash talked often, with increasing frequency before the murder; and Prystash said he was planning the murder and explained the date selected would provide Robert Fratta with the alibi of being at church with his children. *Concerning the day of the murder*, Gipp's admissible testimony was: she returned to her apartment between 4:00 and 4:30 p.m. to find Guidry on the staircase landing, and he stated he was waiting for Prystash; Prystash arrived 30 minutes later, changed his clothes, and left; she observed both Guidry and Prystash wearing black; Prystash returned to her apartment at around 8:30 p.m., and Guidry entered his apartment around that time; Prystash went into the bedroom and unloaded a gun which he said he had obtained from Robert Fratta; leaving the gun in the apartment, Prystash left an hour later, saying he had to meet Robert Fratta to

51

receive $1000; and Gipp recovered bullet casings from the trash and recorded the name and make of the gun.

As the district court observed, however, without the confession or Prystash's statements implicating Guidry, there is little evidence of Guidry's participation in the murder. Although the neighbors testified they observed a black male at the scene, they could *not* positively identify Guidry and told police they thought the assailant could be white. And, although Guidry had the murder weapon in his possession when he was arrested in early 1995, this was four months after the murder, when the gun was used in the commission of a robbery.

Moreover, there is *no* evidence tying Guidry to the charged capital offense of murder for remuneration. Under Texas law, proof of murder for remuneration or promise of remuneration requires a "focus ... on the actor's intent or state of mind: Did the actor kill in the expectation of receiving some benefit or compensation"? *Urbano v. State*, 837 S.W. 2d 114, 116 (Tex.Crim.App. 1992). Of course, this state of mind element must be proved beyond a reasonable doubt; "[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient". *Id*. Although $1050 was found in Robert Fratta's vehicle, there is *no* admissible evidence tying Guidry to it.

The district court's conclusions were correct. Without the confession and challenged hearsay, there is insufficient evidence

to convict Guidry of murder for remuneration or promise of remuneration. Because of the substantial prejudice of permitting this contested evidence before the jury, its erroneous admission was *not* harmless error. Accordingly, the district court properly granted conditional habeas relief, pursuant to 28 U.S.C. § 2254(d).

## III.

For the foregoing reasons, the judgment is

**AFFIRMED.**

53

EMILIO M. GARZA, Circuit Judge, dissenting:

The majority holds that (1) the district court did not err in its application of sections 2254(d)(2) and 2254(e)(1) of AEDPA when it disregarded the state trial court's finding that Howard Guidry did not ask to speak to an attorney before confessing to murdering Farah Fratta and (2) that the district court did not abuse its discretion in holding an evidentiary hearing to rehear the same testimony heard by the state court. Given the conflicting testimony and ample evidentiary record in the state proceeding, these holdings fail to afford to the state court's decision the deference mandated by AEDPA.

The majority states, with apparent approval, that "pursuant to [28 U.S.C. § 2254(e)(1)], the district court did not accept the state court's determinations of fact *because* the trial court made *no* findings on considerable evidence critical to Guidry's claims." (first emphasis added). It then notes that the state trial court "omitted the testimony of four lawyers))Duer, Gottlieb, Scott, and Yarborough. . ." in its written findings, states that this testimony "is crucial for determining whether Guidry asked for his attorney" and, without further explication, concludes that "[t]he district court did not err in its application of subpart (e)(1)." Thus, under the majority's analysis, the trial court's failure to explicitly address the attorneys' testimony in its findings of fact apparently permitted the district court to disregard the presumption of correctness that would otherwise have attached to the state court's conclusion that Guidry did not ask to speak to his attorney.

Section 2254(e)(1) provides that "a determination of a factual issue by a state court shall be presumed to be correct" and that the petitioner "has the burden of rebutting the presumption of correctness by clear and convincing evidence." I find nothing in this language to support the proposition, seemingly endorsed by the majority, that a habeas petitioner can satisfy his burden under subpart (e)(1), and thereby discredit the state court's factual finding, merely by pointing to a failure by the trial court to make explicit credibility findings regarding particular witnesses.[1] The question before this Court is not whether the state court adequately addressed all of the testimony it heard in its findings of fact, but whether Guidry overcame by clear and convincing evidence the statutorily-mandated presumption that the state court's finding))that Guidry did not ask to speak to his attorney before confessing to the murder of Fratta))was correct.

The majority notes that Roberts' testimony before the state court contained contradictory testimony about whether he knew Guidry had counsel[2] and that the testimony of the three attorneys about

---

[1] This court has previously held that the presumption of correctness that attaches to state court findings of fact under AEDPA applies even in cases where the habeas petitioner was denied a full and fair hearing in state court. *Valdez v. Cockrell*, 274 F.3d 941, 942 (5th Cir. 2001). It seems to me inconsistent to now suggest that the AEDPA-mandated presumption of correctness is nevertheless inapplicable where the petitioner shows that, while he was granted a full and fair hearing and the state court explicitly made the factual finding now being contested, the state court failed to articulate credibility findings regarding witness testimony that the federal court found sufficiently troubling.

[2] Both detectives, however, consistently maintained that Guidry never asked to speak to his lawyer.

Roberts' subsequent in-chambers statement, if believed, supports Guidry's version of events and undermines Roberts' credibility. But the three attorneys' testimony suffered from its own weaknesses. In the first state evidentiary hearing, Gottlieb testified that she stated to two police officers that Guidry had an attorney and that the officers replied that they had "talked to the attorney and gotten permission to talk to Mr. Guidry before [they] took him out to save his statement, make a statement and to give [them] a tour of the scene of the crime." Gottlieb identified Hoffman (the "bigger of the two") as the one who made the statement. At the second state evidentiary hearing, however, Gottlieb testified that Scott, not she, was the one who asked about the confession and identified Roberts ("the short one") rather than Hoffman as the officer who claimed that they had received permission from Guidry's attorney. Scott, in turn, testified that supervisor Danny Billingsly, not Hoffman, was the second officer present during the conversation. Scott also testified that Roberts might have been joking or "smarting off" when he made the statement.[3]

Whether Guidry asked to speak to his attorney necessarily turns on whose version of events the fact finder finds credible))Guidry or the detectives who questioned him. The credibility of the detectives' testimony, in turn, depends in part on the credibility of the three attorneys' recollection of the alleged in-chambers

_____

[3] The state court also noted that Guidry admitted to "habitually being cooperative" with police.

-56-

conversation. *If* Roberts told the three attorneys that he had obtained permission for Guidry's attorney before questioning Guidry and *if* he intended that statement to be believed, then those facts strongly support Guidry's version of the events preceding his confession. On the record before us, however, those factual conclusions are not compelled in light of the inconsistent testimony of witnesses on both sides. *See Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) ("[W]here the court's finding is based on its decision to credit the testimony of one witness over that of another, that finding, if not internally inconsistent, can virtually never be clear error."); *Miller v. Fenton*, 474 U.S. 104, 114 (1985) ("When. . .the issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for. . .according [the trial court's] determinations presumptive weight."). Accordingly, Guidry has not shown by clear and convincing evidence that the trial court's determination that he did not ask to speak to his lawyer was incorrect and there is therefore no legal basis to hold that the trial court's decision was based upon an unreasonable determination of the facts in light of the evidence presented.

Again focusing on the trial court's failure to make explicit credibility determinations regarding the attorneys' testimony, the majority concludes that the implied credibility determinations of the trial court are "too extraordinary to avoid development through

an evidentiary hearing in district court" and therefore holds that the district court did not abuse its discretion in ordering such a hearing. I disagree. The district court had before it an ample record with which to determine whether the trial court's decision was based on an unreasonable determination of the facts in light of the evidence presented. As the majority acknowledges, "Guidry requested, and received, an evidentiary hearing in state court and provided ample evidence, to say the least, for the factual basis of his Fifth Amendment claim. Testimony at the pre-trial hearings. . .more than adequately developed that factual basis." In other words, the state court allowed Guidry every opportunity to develop his version of the events surrounding his confession and there is no suggestion that Guidry was prevented from introducing any evidence helpful to his claim. Given the extensive development of the evidence in state court and the apparent contradictions in the testimony of many of the witnesses, an additional evidentiary hearing could offer little aid in determining whether the trial court's factual determination was unreasonable in light of the evidence presented.

To the contrary, the record supports a holding that the evidentiary hearing was an abuse of discretion because it appears that the district court used the proceeding not to hear new evidence but instead to substitute impermissibly its own credibility determinations for those of the state court. After the hearing, the district court explained "I need to be able to make some credibility

determination on my own and figure out what's going on.  Now that I have heard the evidence, I guess it's time for me to look at basically the same issues again but with a little more knowledge." The district court later rejected the State's argument that it had to defer to the state court's credibility determinations so long as they were supported by the record because "[e]ach of the cases cited by the [State concerned] a district court's inability to reconsider a state court's credibility determination on the basis of the record alone."  Here, the court noted, its "credibility evaluation focuses not on the cold record, but on the same live witnesses, and presumptively the same demeanor, as was presumably considered by the trial court.  This Court's evaluation of the witnesses' credibility, therefore, extends beyond a mere review of whether the record supports the state court determination."

A district court may, in an appropriate case, reject the factual findings and credibility determinations of a state court. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  But the court may not substitute its own credibility determinations for those of the state court simply because it disagrees with the state court's findings.  *See Pondexter v. Dretke*, 346 F.3d 142, 147-49 (5th Cir. 2003) (finding that the district court "failed to afford the state court's factual findings proper deference" by "rejecting the state court's credibility determinations and substituting its own views of the credibility of witnesses").  In this case, the trial court's factual conclusion turned on credibility determinations.  There were

weaknesses in the testimony of witnesses on both sides, and the trial court's factual determination made clear that it credited the detectives testimony that Guidry had not asked to speak to an attorney. Because the evidentiary record was more than adequate, and because there was insufficient justification for rejecting the factual finding and accompanying implied credibility determinations of the district court, there was no justification for the district court's *sua sponte* decision to conduct its own evidentiary hearing. Accordingly, I would hold that the district court abused its discretion. *See Villafuerte v. Stewart*, 111 F.3d 616, 633 (9th Cir. 1997) (holding that the district court did not abuse its discretion in denying a request for an evidentiary hearing to hear the same evidence heard in the state habeas proceeding and stating that "[t]his is not a valid reason for an evidentiary hearing in district court"); *Guerra v. Johnson*, 90 F.3d 1075, 1078 (5th Cir. 1996).

For the above stated reasons, I respectfully dissent.[4]

---

[4] Because I conclude that admission of Guidry's confession did not violate his Fifth Amendment right, and because his confession along with other evidence establishes that Guidry murdered Fratta in exchange for a promise of $1,000, I would find that admission of Mary Gipp's testimony did not have a substantial and injurious effect in determining the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).